AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>ERIC SNYDER, and<br>CHRISTOPHER FULLER, | )<br>)<br>)<br>)<br>)<br>)  Case No. *17-8268-DLB* |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     January 2011 - September 2015     in the county of          Palm Beach          in the

    Southern     District of          Florida          , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud (all defendants) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SPECIAL AGENT JOSHUA E. HAWKINS, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     07/07/2016

_____
*Judge's signature*

City and state:          West Palm Beach, Florida

U.S. MAGISTRATE JUDGE DAVE LEE BRANNON
*Printed name and title*

## AFFIDAVIT

I, Special Agent Joshua E. Hawkins, being duly sworn, do hereby depose and state:

### Affiant's Background

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed in this capacity since January 2006.  I am currently assigned to a squad of the Palm Beach County Resident Agency of the Miami Division that investigates a wide variety of federal crimes, including health care fraud.  Prior to being assigned to the Palm Beach County Resident Agency in 2015, I was assigned to a health care fraud squad in Miami for approximately 4 ½ years. I have received training from the FBI on matters related to health care fraud investigations and have attended multiple conferences and seminars on conducting health care fraud investigations.

2.     I am personally involved in conducting a joint investigation with other federal, state, and local law enforcement agencies into alleged criminal activities perpetrated by HALFWAY THERE FLORIDA LLC (HWT), also known as A SAFE PLACE LLC (ASP), a sober home; and REAL LIFE RECOVERY DELRAY, LLC (RLR), an addiction treatment facility, (collectively known as HWT/RLR); the owner, ERIC SNYDER; and other staff members, contractors and affiliates, including but not limited to CHRISTOPHER FULLER.  The statements contained in this Affidavit are based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

3.     I am submitting this Affidavit in support of a criminal complaint charging ERIC SNYDER, and CHRISTOPHER FULLER with conspiracy to commit health care fraud, in violation of 18 U.S.C. §1349.  Because this Affidavit is provided for the limited purpose of establishing probable cause for an arrest, I have not included all information known to me

regarding this investigation, but rather have set forth only those facts necessary to establish probable cause to believe that the defendants have committed the charged offenses.

4.      As used herein, the "Investigative Team" consists of agents, employees, and task force officers of the Federal Bureau of Investigation, agents and employees of the Internal Revenue Service, Department of Labor, Amtrak Office of Inspector General, Office of Personnel Management Office of Inspector General, prosecutors from the U.S. Attorney's Office, U.S. Department of Justice, and State Attorney's Office for the 15th Judicial Circuit of Florida ("SAO"), and members of the SAO Sober Home Task Force.

## The Treatment Centers

5.      On December 3, 2010, SNYDER filed document number L10000124486 with the Florida Secretary of State, effectively organizing and incorporating ASP, a sober home, under the laws of Florida.  SNYDER electronically signed the Articles of Organization on December 3, 2010.  On March 20, 2014, SNYDER filed a 2014 Florida Limited Liability Company Annual Report with the Florida Secretary of State.  The 2014 report listed SNYDER as the managing member of ASP.  The principal place of business and mailing address were listed as 1100 SW 4th Avenue, Apartment 21B, Delray Beach, Florida 33444.

6.      On September 4, 2013, SNYDER filed document number L13000124822 with the Florida Secretary of State, effectively organizing and incorporating HWT, a sober home, under the laws of Florida.  SNYDER electronically signed the Articles of Organization on September 4, 2013.  On March 12, 2014, SNYDER filed a 2014 Florida Limited Liability Company Annual Report with the Florida Secretary of State.  The 2014 report listed SNYDER as the managing member of HWT.  The principal place of business and mailing address were listed as 1100 SW 4th Avenue, Delray Beach, Florida 33444.

7.      According to a Wells Fargo Bank N.A. Addendum to Certificate of Authority dated September 23, 2013, the bank's customer name is listed as A SAFE PLACE LLC DBA HALF WAY THERE. SNYDER signed the document as the president of the company.

8.      On May 16, 2011, document number L11000057315 was filed with the Florida Secretary of State, effectively organizing and incorporating RLR, an addiction treatment facility, under the laws of Florida.   SNYDER is listed as one of the managers on the Articles of Organization.  On March 12, 2014, SNYDER filed a 2014 Florida Limited Liability Company Annual Report with the Florida Secretary of State.   The 2014 report listed SNYDER as the managing member of RLR.   The principal place of business and mailing address were listed as 258 SE 6th Avenue, Suite 7, Delray Beach, Florida 33483.

### The Defendants

9.      Defendant ERIC SNYDER was the true owner of HWT/RLR, managing all aspects of the addiction treatment facility and sober home, including hiring and firing personnel, admitting and discharging patients, and making financial decisions.

10.      Defendant CHRISTOPHER FULLER was a patient broker employed by SNYDER. FULLER allegedly received a "consulting" fee in exchange for recruiting patients to the HWT/RLR.

### Background on Drug and Alcohol Rehabilitation

11.      In recent years, South Florida, particularly Palm Beach and Broward Counties, have become destinations for drug and alcohol addicts seeking assistance in becoming and remaining sober. News reports estimate treatment for substance abuse is Palm Beach County's fourth largest industry, with revenues in excess of $1 billion per year.  Substance abuse treatment is regulated under state and federal law, which describe a continuum of care including, from most intensive to

3

least intensive, inpatient detoxification (Detox), Partial Hospitalization Programs (PHP), Intensive Outpatient Programs (IOP), and Outpatient Programs (OP).  Some persons undergoing treatment on an out-patient basis, whether in PHP, IOP, or OP, will elect to live in a "recovery residence," also known as a "sober home" or "halfway house," with other persons who are also in treatment and committed to a drug and alcohol-free lifestyle.

12.   Detox is meant for individuals who are still addicted to and using controlled substances and/or alcohol.  Detox facilities are inpatient facilities where patients are assisted in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox, patients receive treatment for their underlying addiction in the form of outpatient care, either through PHPs, IOPs, and OPs.  PHP, IOP, and OP patients attend facilities on an ongoing basis where treatment is rendered, generally in the form of therapy sessions.  The distinction between the three relates to the amount of therapy time on a daily or weekly basis, and patients generally transition from detox to PHP, then to IOP, and finally to OP as they overcome their addiction.

## Federal Guidelines for Substance Abuse Treatment

13.   The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") promulgated guidelines for substance abuse treatment.  Those guidelines referred to varying levels of treatment provided based on the severity of the addiction, including, for purposes of this Affidavit, detox, PHP, IOP, and OP.

14.   According to SAMHSA's Guidelines, detoxification is a set of interventions aimed at managing acute intoxication and withdrawal.  It denotes a clearing of toxins from the body of

4

the patient who is acutely intoxicated and/or dependent on substances of abuse. Detoxification seeks to minimize the physical harm caused by the abuse of substances.

15.   PHPs (as defined by SAMHSA) are formal substance abuse treatment programs that provide services to clients with mild to moderate symptoms of withdrawal that are not likely to be severe or life-threatening and that do not require 24-hour medical support. PHPs are considered a "step down" from an inpatient detoxification program. Clients attending PHPs are supposed to participate in 30 of more hours of treatment per week, often provided in at least six hour-long sessions per day, for five days per week. Clients who successfully complete a PHP program should transition to IOP.

16.   According to SAMHSA's Guidelines, IOPs were formal substance abuse treatment programs that adhered to a set of formal guidelines. IOPs had to be overseen by a qualified professional. Clients had to receive a thorough evaluation to determine the stage and severity of their illness, including medical and mental disorders. Qualified medical personnel were to assign clients to a formal treatment plan. The IOP was accountable for the treatment or referral of the client to additional services as necessary. The IOP was obligated to maintain contact with the client until recovery was completed. SAMHSA's Guidelines recommended that IOPs provide at least nine hours of treatment per week, typically in three 3-hour sessions. Clients at IOPs also were supposed to attend at least one 30-60 minute individual counseling session per week.

17.   In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes. Sober homes generally do not provide medical care or clinical services to their residents, but operate solely as group residences where residents can live with a support network of others in recovery. Since sober homes are merely places to live, they generate income

to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

## Substance Abuse Treatment in Florida

18.     Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), which recognized that "[s]ubstance abuse impairment is a disease which affects the whole family and the whole society and requires a system of care that includes prevention, intervention, clinical treatment, and recovery support services that support and strengthen the family unit." Fl. Stat. §§ 397.301, 397.305(1).

19.     The Marchman Act was enacted to provide for a comprehensive continuum of accessible and quality substance abuse prevention, intervention, clinical treatment and recovery support services in the least restrictive environment which promotes long-term recovery while protecting and respecting the rights of individuals." Fl. Stat. §397.305(3). The "comprehensive continuum of accessible and quality…clinical treatment services," included, for purposes of this affidavit, "day or night treatment" (equivalent to SAMHSA's "PHP"), intensive outpatient treatment, and outpatient treatment. Fl. Stat. § 397.311(a).

20.     Regardless of which category of service was provided, every type of "clinical treatment" needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. §397.311(a).

21.     In addition to substance abuse service providers, the Marchman Act provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment." § 397.311(36).

## Payment for Substance Abuse Treatment and Testing

22.     Title 18, United States Code, Section 24(b), defines "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

23.     In this case, HWT/RLR and a series of external laboratories submitted claims for reimbursement to numerous private insurance companies benefit plans.  Private insurance companies, including Blue Cross Blue Shield (BCBS), Aetna, United HealthCare, Cigna, and others (jointly referred to as "the Insurance Plans"), offer health care coverage directly to consumers and through employers, including ERISA and non-ERISA plans.  They also manage health care plans offered to federal employees.  BCBS was the insurance company that handled most of the claims submitted by HWT/RLR.

24.     All of these Insurance Plans affect commerce and are "health care benefit programs" for purposes of 18 U.S.C. § 24(b).  The health plans cover medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that testing and treatment be medically necessary.

25.     Regardless of the type of Insurance Plans held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims. The Insurance Plans all cover substance abuse treatment and testing costs in accordance with the terms of their policies and state and federal law, including requirements that testing and treatment be medically necessary and actually rendered, provided by properly licensed facilities,

and provided in accordance with the terms of the Insurance Plans' contracts, including the requirement to collect co-pays and deductibles.

26.    Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva.  Urine Analysis or urinalysis ("UA") testing is used to detect recent drug or alcohol use by a patient.  UA testing complexity ranges from screening tests – also known as point of care ("POC") testing – which provides instant results, to confirmatory testing, which is sent to a laboratory, for more complex analysis.  UAs can be billed to insurance companies, as long as the urine test is medically necessary and ordered by a medical doctor.

27.    Sober homes committed to the sobriety of their residents use UA to confirm that residents are abiding by the rules against drug and/or alcohol abuse.  Sober homes acting in compliance with SAMHSA's recommendations expel residents whose UA show recent drug and/or alcohol abuse.

28.    Point of Care ("POC") urine testing involves collecting a patient's urine in a specific cup designed for testing.  The specimen is analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results.  POC urine testing usually tests for the presence of 9 to 13 specific types of drugs.  POC tests typically cost between $5 and $10 and could be read easily by a layperson.  This testing is convenient, inexpensive, and the results can be read quickly.  POC testing is the most common form of testing performed at sober homes and treatment facilities.

29.    Confirmatory testing, conducted in a laboratory setting, uses gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the patient's urine specimen.  These techniques are highly sensitive,

and accurately and definitively identify specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing is more precise, more sensitive, and detects more substances than other types of urine testing. Results of confirmatory testing take longer and the tests are significantly more expensive—costing well over $1,000.

30.     The Insurance Plans provided guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, for the types and frequency of testing that would be reimbursable. This guidance was based upon policy statements from the American Society of Addiction Medicine ("ASAM"), publications by expert researchers in the area of substance abuse treatment, and policies of federal and state governmental agencies. For example, Blue Cross/Blue Shield ("BCBS") issued guidance on November 15, 2013, stating that, in certain circumstances, drug-screening tests could be used in connection with substance abuse treatment where a patient is suspected of drug misuse and there was a suspicion of continued substance abuse. Drug screening tests were not medically necessary, however, where simultaneous blood and urine testing was occurring or where testing was merely a routine part of a physician's treatment protocol.

31.     In 2014, BCBS provided more specific guidance that categorized urine drug testing into two categories. "Immunoassay testing" (also referred to as qualitative testing or screening tests") could be performed either in a laboratory or at a point of service and reported positive or negative results for classes of drugs, rather than individual drugs within that class. "Specific drug identification" (also known as quantitative testing or confirmatory testing) could only be performed in a laboratory and usually involved the use of gas chromatography/mass spectrometry. Quantitative/confirmatory tests could quantify the

amount of drug or metabolite present in a urine sample and could be used to confirm the presence of a specific drug that could not be isolated via immunoassay testing.

32. BCBS provided that, in an outpatient substance abuse treatment setting, in-office of medical necessity under the following conditions: (1) baseline screening before initiating treatment or at the time treatment was initiated, one time per program entry, when a clinical assessment of patient history and risk of substance abuse was performed, the clinicians had knowledge of test interpretation, and there was a plan in qualitative urine drug testing meets the definition place regarding how to use test finding clinically; (2) during the stabilization phase of treatment, targeted weekly qualitative screening was appropriate for a maximum of 4 weeks; and (3) during the maintenance phase, targeted qualitative screening was appropriate once every 1 to 3 months. Qualitative urine drug testing was limited to fifteen (15) tests within a 12-month period.

33. BCBS further provided that quantitative/confirmatory urine drug testing met the definition of medical necessity only when immunoassays for the relevant drugs were not commercially available or in specific situations for which quantitative drug levels were required for clinical decision making such as where an unexpected positive test was inadequately explained by the patient, there was an unexpected negative result for prescription medication, or there was a need for quantitative levels to compare with established benchmarks. Quantitative/confirmatory urine drug testing was limited to twelve (12) tests within a 12-month period

34. BCBS specified that urine drug testing (whether qualitative or quantitative/confirmatory) did not meet the definition of medical necessity in the case of: (1) routine qualitative or quantitative urine drug testing (e.g., testing at every visit, without consideration for specific patient risk factors or without consideration for whether quantitative

testing was required for clinical decision making); (2) quantitative testing instead of qualitative testing or as a routine supplement to qualitative testing; (3) simultaneous blood and urine specimen testing; and (4) testing for residential monitoring. Furthermore, oral fluid (i.e., saliva) drug testing was considered experimental or investigational and was not covered.

35.     To bill insurance companies for substance abuse treatment and bodily fluid testing, substance abuse treatment facilities and labs submit paper and electronic claims using a number of standardized forms, including the "CMS-1450," the "CMS-1500," and the "HCFA-1500". ("CMS" refers to the Centers for Medicare and Medicaid Services, and "HCFA" refers to the Health Care Financing Administration, the predecessor to CMS.) Regardless of the form used, by submitting a claim, the provider is certifying that the treatment or lab service was medically necessary and actually rendered, and the provider is warned that providing false, incomplete, or misleading information can result in civil and criminal penalties. Before billing for lab tests, providers must first obtain a prescription from the patient's medical doctor, who must deem the test medically necessary.

36.     Unlike treatment facilities, sober homes generally do not provide medical care or clinical services to their residents, but operate solely as group residences where residents can live with a support network of others in recovery. Since sober homes are merely places to live, they generate income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

### Florida's Prohibition on Patient Brokering and Kickbacks

37.     Patient brokers or marketers are individuals who recruit patients and direct them to particular treatment facilities in exchange for a fee or some type compensation.

38.     Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," makes it unlawful for any person, including any health care provider or health care facility, to:

> (a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c).

Fla. Stat. §§ 817.505, 456.054(2).

39.     Florida law also states that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7) (a).

### The Charged Offenses

40.     Federal law makes it a crime for anyone to knowingly or willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.  18 U.S.C.

§ 1347(a).  Conspiracies and attempts to commit health care fraud also are violations of federal law.  18 U.S.C. § 1349.

41.    A "scheme or artifice to defraud" includes schemes to deprive another of the "intangible rights of honest services" through the use of kickback and bribery schemes.  18 U.S.C. § 1346; see also Fordham v. United States, 706 F.3d 1345, 1348, 1349 n.4 (11th Cir. 2013) (discussing Skilling v. United States, 561 U.S. 358 (2010)).

42.    To be convicted of health care fraud, one need not have actual knowledge of 18 U.S.C. §1347(a) or the specific intent to violate it.  18 U.S.C. §1347(b).

43.    A "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item or service for which payment may be made under the plan or contract."  18 U.S.C. §24(b).  In this case, HWT/RLR billed private insurance policies and Affordable Care Act insurance plans, both of which fall within the definition of "health care benefit programs."

44.    Additionally, paying or receiving kickbacks also violates the federal Anti-Kickback Act, 42 U.S.C. §1320a-7b (b), if the kickbacks are paid or received in connection with a "Federal health care program," which is defined to include "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government..." or "any State health care program."  42 U.S.C. §1320a-7b (f).  The investigative team is investigating whether HWT/RLR billed and received payments from any directly federally funded programs, and any State health care programs.  As noted above, private insurers who offered their insurance through the Affordable Care Act were billed by HWT/ALR.

## The Defendants' Involvement in Health Care Fraud

45.      Numerous former patients, employees, and executives of HWT/RLR have provided information to the Investigative Team in regards to fraudulent activity and bogus treatment being conducted at HWT/RLR.  Fraudulent billings were submitted for services that were not medically necessary and/or were never provided.  Information provided by licensed health professionals describe treatment as being conducted by unqualified and non-licensed employees.  The licensed professionals were then asked to sign for and/or backdate this treatment as though they had conducted it.  The licensed professionals were also asked to complete intake forms for patients that they had not seen.  Urine Analysis was fraudulently used as a profit-machine at HWT/RLR, including double billing for the same patients and splitting samples to maximize revenue.  Patient recruiters, including FULLER engaged in improper patient brokering to refer clients to HWT/RLR, and illegal kickbacks were provided to patients in the form of free rent based on attendance at therapy sessions.  After a search warrant was executed at Good Decisions Sober Living (GDSL), a treatment facility in Palm Beach County, in September 2014, SNYDER and others attempted to discontinue or modify these illegal practices, and evidence of this wrongful conduct was removed and destroyed.  Such fraudulent conduct is outlined in more detail below.

### Billing for Services Not Rendered

46.      On September 26, 2014, Cooperating Witness 1 (CW1), an employee of HWT/RLR and former director of operations, sent an unsolicited email to the FBI Miami Division's general email address titled, "South Florida drug rehab insurance frauds."  In the email, CW1 explained that he/she is a high-ranking employee of HWT/RLR who wished to provide information to the FBI about HWT/RLR prior to leaving the company.  In response to the email, on three separate occasions between October 29, 2014 and November 19, 2014, law enforcement officers assigned

14

to this investigation interviewed CW1.  During the course of these interviews, CW1 explained the fraudulent activity occurring at HWT/RLR.

47.     CW1 observed instances where HWT/RLR fraudulently billed patients' insurance companies for services not rendered.  It became standard, for example, if a patient was discharged from HWT/RLR on the first day of a given month, HWT/RLR continued to bill that client's insurance company for treatment through the end of the month.  CW1 was aware of this practice because he/she heard individuals at HWT/RLR discussing it and because he/she personally fielded telephone calls from clients complaining that they were billed after their date of discharge.

48.     On October 1, 2014, Cooperating Witness 2 (CW2),[1] a former patient of HWT/RLR, made an unsolicited telephone call to the FBI's public access line to report possible fraudulent insurance billing occurring at HWT/RLR.  Following the telephone complaint, on October 9, 2014, law enforcement officers assigned to this investigation interviewed CW2.  CW2 was a client of HWT/RLR until October 4, 2014.  CW2 had a Humana insurance policy that covered addiction rehabilitation services.  Although CW2 did not attend IOP sessions on weekends, a review of CW2's explanation of benefits (EOBs) showed multiple instances where HWT/RLR billed his/her Humana policy for treatment sessions supposedly rendered on Sundays. CW2 cited, as an example, a $2,754.38 charge from Sunday, August 3, 2014 for treatment he/she did not receive.  During this time, SNYDER was the owner of HWT/RLR.

49.     In an interview in April 2015, Cooperating Witness 4 (CW 4), a former patient, was shown a spreadsheet containing claims submitted by RLR to his insurance company.  CW4 identified claims for services purportedly rendered on June 10 and 11, 2013.  CW4 stated that he

---

[1] CW2 had a current, non-extraditable warrant in the State of Texas for theft between $500 and $1,500. CW2 has multiple arrests in the late 1980's and early to mid 1990's for driving under the influence. CW2 was also arrested for sexual assault and aggravated assault with serious bodily injury in 1989.

was serving a 30 to 45 day sentence at that time for probation violation, and could not have gotten such treatment. A review of the insurance billing showing that CW4's insurance was fraudulently billed for services on June 10, 2013 for $875 and was paid $787.50. In addition, on June 11, 2013, CW4's insurance was fraudulently billed approximately $2,400, and paid approximately $205, for services that CW4 did not receive.

50.     Cooperating Witness 5 (CW5) was a former medical biller who handled billing for HWT/RLR. According to CW5, SNYDER would submit insufficient documentation and/or documentation that appeared to CW5 to be forged, for CW5 to use/rely upon when billing. For instance, documentation may include sign-in sheets to record patient attendance at treatment sessions. CW5 frequently saw instances where several names were written in the same handwriting. CW5 questioned SNYDER regarding these issues, which caused arguments between the two. SNYDER eventually fired CW5.

51.     Cooperating Witness 6 (CW6) was a therapist at HWT/RLR who was interviewed on May 22, 2015 by the Investigative Team. CW6 complained to SNYDER regarding patients who would sign-in for therapy sessions and then leave. SNYDER instructed the witness to leave the names of the clients who left on the sign-in sheet so that the patient's insurance could be billed. CW 6 also noted that patients would sign in for other patients who were not present at the therapy sessions. CW6 further noted that SNYDER fraudulently had documents created and backdated to fill in patient charts prior to audits of HWT/RLR.

52.     Cooperating Witness 7 (CW7) was a therapist and clinical director at HWT/RLR who was interviewed by the Investigative Team on May 15, 2015. CW7 accepted the clinical director position, but wanted to leave shortly afterwards because he/she was asked to do things CW7 thought were improper, to include fraudulently signing notes for therapy sessions for patients

that never occurred, and to fraudulently create intake forms for patients that CW7 had never seen. CW7 was eventually terminated from HWT/RLR, and before CW7 left he/she was asked to backdate documents and forms by the new clinical director.

## UA Billing Fraud

53.     Both CW1 and CW2, in addition to other witnesses, stated that HWT/RLR required clients to submit UA samples multiple times per week.  This testing was done on-site at HWT/RLR and by outside laboratories.  According to CW1, HWT/RLR employees, as a practice, split single client samples into multiple testing cups, allowing the HWT/RLR to test and fraudulently bill the same sample of urine over multiple days.  This usually occurred around the time a client was discharged.  As part of this improper practice, urine samples from different clients were then comingled prior to lab testing.  This process was done in an effort to prevent identical test results that could have potentially alerted authorities to the scheme.

54.     Cooperating Witness 3 (CW3), an employee of HWT/RLR who resigned on December 1, 2014, was interviewed on three occasions between November 25, 2014 and December 8, 2014.  For a period of time, CW3's job duties included assisting in the collection of UA samples from HWT/RLR's clients.  As part of the process, CW3 was instructed to collect at least a 50-milliliter sample from each client.  After collecting the urine specimen, CW3 brought the sample into the office, and another HWT/RLR employee would then fraudulently split each specimen into three additional testing cups.

55.     According to CW2, upon reviewing his/her Humana EOBs, CW2 identified multiple instances where HWT/RLR fraudulently billed Humana for duplicate UA tests that supposedly occurred on the same day.  CW2 never took two UA tests on the same day.

17

56.     According to CW3, because admissions at HWT/RLR had been low, UA test results were irrelevant; clients were allowed to continue living at HWT/RLR whether or not they tested positive for drugs or alcohol.  This indicates that UAs are completed for the insurance proceeds, not for the care and benefit of the patients.

57.     Cooperating Witness 8 (CW8), an employee of HWT/RLR who began working at HWT/RLR in early 2012 as a UA Technician, and resigned in November 2014, was interviewed in by the Investigative Team in February and March 2015.  CW8 described how UA samples were split and sent to different labs for testing to maximize billing.  CW8 also described a pass through billing scheme for UA testing where UA samples were sent out for analysis tests and for confirmation testing, which greatly increased HWT/RLR's revenue because confirmation tests paid/cost more.  CW8 described how double-billing for UA tests for the same patient at HWT and RLR took place, and that SNYDER and others were aware of this.  CW8 and other witnesses noted that patients and/or their families often complained about large UA lab billing charges to their insurance.

58.     Cooperating Witness 9 (CW 9), a UA technician at HWT/RLR, was interviewed by the Investigative Team in April 2016.  CW9 confirmed UA specimens were fraudulently split on a regular basis, but noted that this practice stopped after a search warrant was executed at Good Decisions Sober Living (GDSL) in September 2014.

## Client Brokering and Kickbacks

59.     According to both CW1 and CW3, and numerous other former employee witnesses, HWT/RLR offered improper incentives (i.e., kickbacks) to patients in the form of rent breaks.  The standard rent at HWT was $200 per week.  However, clients who attended five IOP sessions per week at RLR lived at the HWT Property rent-free.  Clients who attended three treatment sessions

18

per week received $100 off their weekly balance. On November 28, 2014, CW3 provided to the investigative team a black binder used to document the rent credits applied to clients who attended treatment, substantiating the claims of CW1 and CW3.

60.     Both CW3 and other additional witnesses state SNYDER was aware of and, in fact, was in charge of these rent breaks that were used to improperly recruit patients. CW6 describes SNYDER as stating he would rather "eat [pay] $200 in order to make $5000."

61.     After a Federal search warrant was executed at Good Decisions Sober Living (GDSL) in September 2014, CW3 received direction from SNYDER, and others on how they were changing the structure of the rent breaks to a format they believed would be legal.

62.     Other improper benefits offered to patients included cash payments in exchange for clients who referred friends to HWT/RLR. According to CW1, SNYDER tasked the HWT/RLR Admissions Department with paying clients a referral fee of approximately $200 anytime they referred another client to the program. On occasion, clients would inform CW3 that they were owed a referral credit. When this happened, CW3 would call SNYDER to confirm the information before applying the credit. CW3 documented these credits in QuickBooks.

63.     SNYDER also spoke about purchasing airline tickets for out-of-town clients. This practice was administered by the Admissions Department at HWT/RLR. CW1 was responsible for arranging drivers to pick up some of these out-of-town clients from the airport. Multiple witnesses confirm that SNYDER and his employees enticed insured clients to attend HWT/RLR by improperly offering patients cash, gift cards, trips, airline tickets, and rent discounts.

64.     HWT/RLR solicited clients by using multiple patient brokers, at least one whom was deliberately portrayed as a marketing consultant to conceal the illegal nature of his conduct. According to CW1 and multiple additional witnesses, HWT/RLR paid one recruiter, known to the

19

Investigative Team as CHRISTOPHER FULLER, a "consulting" fee in exchange for recruiting clients to the treatment facility.

65.     FULLER found clients by visiting locations frequented by addicts, to include "crack" motels and Alcoholics' Anonymous meetings.  He was known to give clients drugs or alcohol as an enticement to attend HWT/RLR and so the client would have a UA positive for drugs or alcohol.  Clients recruited by FULLER were required to stay in the HWT/RLR program 24 to 48 hours before he received payment for the referral.

66.     CW8 described how FULLER paid hotel owners and front desk receptionists to call him first whenever they identified potential clients, and that FULLER and SNYDER discussed this practice in front of CW8.  Hotels that FULLER paid for notification included the Homing Inn in Boynton Beach, the Budget Inn in Delray Beach on the Federal Highway, and Southgate in Delray Beach.  CW8 believed that FULLER offered prospective patients drugs as a way to get them to attend HWT/RLR and recalled FULLER's patients as often being high on drugs.  One female patient told CW8 that FULLER bought her drugs in order to attend RLR as a client.

67.     Cooperating Witness 10 (CW10), a maintenance manager at HWT/RLR, was interviewed on June 24, 2015 by the Investigative Team, and described how FULLER and other individuals were used as patient brokers by HWT/RLR.  CW10 described how FULLER provided money and vehicles to patient brokers such as FULLER and others for bringing patients to HWT/RLR.  CW10 and other witnesses referred to patient recruiters such as FULLER as "junkie hunters", and noted how FULLER was paid as an independent contractor to keep him off the books.  CW10 heard that FULLER offered prospective patients drugs as a way to get them to attend HWT/RLR but did not witness this.

68.     Cooperating Witness 11 (CW11), who worked as an admissions intake coordinator at HWT/RLR, was interviewed by the Investigative Team on February 19, 2015. CW11 stated that SNYDER directly employed and directly paid individuals as marketers or patient recruiters, and referred to these marketers, including FULLER, as "junkie hunters." CW11 noted that at first the patients brought in by these recruiters were admitted to HWT/RLR directly by SNYDER, which CW11 complained about because it threw off the daily census. When as a result these marketers then brought their patients to CW11 at intake, CW11 often rejected a particular recruiters' patients because they were high at intake or obviously using drugs, and thus should not be admitted to HWT/RLR. In such cases, the marketer or recruiter, including FULLER, would often contact SNYDER, who would overrule CW11 and force the admission. CW8 confirmed that patients he/she wanted to deny admitting FULLER's patients because they were high on drugs, but that SNYDER instructed CW8 to admit these patients to HWT/RLR.

69.     CW8 described how SNYDER would often frequent strip clubs, casinos, and hotels and restaurants with patients and employees of HWT/RLR, and pay for these outings on the company credit card. CW8 also heard that SNYDER paid for sex acts for patients and employees. CW8 did not go to these strip clubs but heard patients and employees at HWT/RLR describe these outings and SNYDER paying for sex acts on other occasions. CW10 confirmed that SNYDER frequented strip clubs often and tried to get CW10 to attend these outings but CW10 did not go; CW10 did not know if patients went out these outings but confirmed that SNYDER and his friends, including former HWT/RLR patients, did.

70.     FULLER appeared as the payee on a $5,000 Wells Fargo Bank check, dated July 23, 2014, paid from RLR account number 8304389904.

71.     FULLER appeared as the payee on a $378 Wells Fargo Bank check, dated July 28, 2014, paid from RLR account number 8304389904.

72.     SURRENDER AND SURVIVE, INC. (SAS) appeared as the payee on a $12,000 Wells Fargo Bank check, dated August 12, 2014, paid from RLR account number 8304389904. According to the Florida Secretary of State, FULLER appears as the director of SAS, which he incorporated on August 7, 2014.

73.     The Investigative Team has obtained police reports and other documents indicating that FULLER was the patient broker involved in bring Patient #1 to HWT/RLR.  Patient #1 was an addict who, according to his mother, had been dropped off, by HWT/RLR staff, at the Homing Inn, a hotel known for being frequented by addicts using drugs.  Approximately one to two months after attending HWT/RLR, Patient #1 died of an overdose at this location.  FULLER had spoken with Patient #1's mother prior to Patient #1 going to HWT/RLR, demanding $1,400 in payment to get Patient #1 into treatment.

### Knowledge of Fraud / Destruction of Evidence

74.     On September 11, 2014, law enforcement officers assigned to this investigation, served multiple search warrants on GOOD DECISIONS SOBER LIVING, INC. (GDSL), a treatment facility located in West Palm Beach, Florida, which also allegedly engaged fraud. Multiple television and print media outlets in the Palm Beach County-area covered the GDSL search warrant on the day of the operation.

75.     Based on information provided by CW1 and CW3, a number of events transpired following the GDSL search warrant that lead the investigative team to believe SNYDER had knowledge of his fraudulent acts at HWT/RLR.   According to CW1, after learning of the

September 11, 2014 search of GDSL, SNYDER immediately left the HWT/RLR property and did not return to work for one week.

76.     In the days following the search warrant, EMPLOYEE 1 of HWT/RLR, who was a trusted associate of SNYDER's, arrived at the HWT Property with a van and removed all of the hard-copy client files. CW1 assisted EMPLOYEE 1 in moving the files from the HWT Property into EMPLOYEE 1's office and into a closet next to a bathroom on the Western end of the RLR Property. CW3 also confirmed that EMPLOYEE 1 removed documents from the HWT Property in the days following the GDSL search in September 2014.

77.     At HWT/RLR, CW3 was responsible for bookkeeping duties, which included documenting client rent dues, payments and credits. CW3 used the computer program, QuickBooks, to log rent balances. CW3 also used QuickBooks to notate IOP rent credits applied to clients' balances. According to CW3, following the GDSL search, EMPLOYEE 1 took CW3's laptop and deleted the QuickBook files containing IOP rent credit entries. CW3 watched as EMPLOYEE 1 deleted the files, which occurred in his/her office in Unit 10 of the RLR property. EMPLOYEE 1 told CW3 the files were being deleted because: "it was illegal."

78.     As part of the ongoing investigation into HWT/RLR, the investigative team obtained billing documentation submitted by HWT/RLR to multiple private insurance companies, to include the Insurance Plans BCBS, United HealthCare, Aetna, Cigna, and Humana, among others. From at least January 1, 2011 through September 30, 2015, HWT/RLR has submitted claims of approximately $58,209,385 to these Insurance Plans. These claims, in turn, have caused the abovementioned Insurance Plans to mail paper checks or to remit electronic funds transfers to HWT/RLR for approximately $18,656,743.

## CONCLUSION

I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from at least as early as January 1, 2011 through September 2015, in Palm Beach County, in the Southern District of Florida, ERIC SNYDER, and CHRISTOPHER FULLER, and persons known and unknown, conspired to commit health care fraud, this is, to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody and control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, in violation of Title 18, United States Code, Section 1347; all in violation of Title 18, United States Code, Section 1349.

FURTHER AFFIANT SAYETH NAUGHT.

Joshua E. Hawkins
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this __7__ day of July, 2017.

HON. DAVE LEEE BRANNON
UNITED STATES MAGISTRATE JUDGE

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. *17-8268 - DCB*

UNITED STATES OF AMERICA

vs.

ERIC SNYDER, and
CHRISTOPHER FULLER

Defendants.

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  ____ Yes  _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  ____ Yes  _X_ No

Respectfully submitted,

BENJAMIN G GREENBERG
ACTING UNITED STATES ATTORNEY

BY: _____
JAMES V. HAYES
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel:  ((305)-961-9181
Email:  James.Hayes3@usdoj.gov